## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| ANDREW M. BARON, | § | |
| Plaintiff, | § | |
| vs. | § | Civil Action No. 3:16-CV-3465-C-BH |
| | § | |
| LISA BLUE BARON, et al., | § | |
| Defendants. | § | Referred to U.S. Magistrate Judge |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

By *Special Order No. 3-251*, this *pro se* case has been automatically referred for full case management.  Before the Court for recommendation are the following:

(1) *Defendant Stewart Frazer's Motion to Dismiss the First Amended Complaint*, filed July 11, 2017 (doc. 67);

(2) *Defendant Richard McCall's Motion to Dismiss*, filed July 31, 2017 (doc. 69);

(3) *Defendant Lisa Blue Baron's Motion to Dismiss*, filed July 31, 2017 (doc. 71);

(4)  *Stephen Malouf's Motion to Dismiss*, filed July 31, 2017 (doc. 73); and

(5) *Defendants Edward Copley and Akin Gump Strauss Hauer & Feld's Amended Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6)*, filed August 15, 2017 (doc. 86).

Based on the relevant filings and applicable law, the motions to dismiss should be **GRANTED**, and the claims against Bank of America, N.A., f/k/a U.S. Trust Company, N.A. and Reassure Life Insurance should be *sua sponte* **DISMISSED** for failure to state a claim.

## I. BACKGROUND

On December 20, 2016, Andrew M. Baron (Plaintiff) filed this *pro se* lawsuit alleging breach of a settlement agreement concerning the distribution of his late father's estate.  (*See* doc. 3.)  He later amended his complaint to also assert claims of conspiracy to commit fraud and tortious interference with an expectancy of an inheritance against defendants Lisa Blue Baron (Stepmother),

Edward Copley (Estate Lawyer), Stephen P. Malouf (Mediator), Richard McCall (Trustee), Stewart Frazer (Attorney), Akin Gump Straus Hauer & Feld (Law Firm) (collectively Defendants), as well as Reassure Life Insurance[1] (Insurer) and Bank of America, N.A. f/k/a U.S. Trust Company, N.A.[2] (Bank). (*See* doc. 85 at 1, 26.)[3]

Plaintiff claims that on April 11, 1996, his father, Fred Baron (Father), created the Baron Children's Trust (Children's Trust) for his benefit as well as that of his sister, Courtney (Sister). (doc. 85 at 4.) He contends that the Children's Trust is an "[i]rrevocable" trust that by its terms cannot be changed. (*Id.*) It was allegedly the named beneficiary of three separate term life insurance policies purchased by Father, each valued at $3 million: (1) the Transamerica Occidental Life Insurance Company policy, purchased July 12, 1996; (2) the policy from Insurer, purchased May 1, 1998; and (3) the John Hancock Life Insurance Company policy, purchased October 4, 2001 (collectively Policies). (*Id.* at 5.)

Father was diagnosed with terminal cancer in 2002, and began undergoing treatment. (*Id.* at 6.) Plaintiff alleges that in 2006, Stepmother "compelled [him] to have a baby" even though he "did[ not] want to have any additional children . . . ." (*Id.*) When he agreed, Stepmother "created a number of embryos in a lab" using his sperm and eggs from a paid donor, and they had a child, AB, through a surrogate. (*Id.* at 6-7.) After AB was born, Stepmother allegedly "compelled" Father to add AB to his will, but he refused and instead created the "AB Irrevocable Trust." (*Id.* at 7.)

---

[1] A summons was issued for Insurer, but no proof of service has been filed, and it has not appeared in this action. (*See* doc. 59-1 at 1-2.)

[2] Although a summons was issued for US Bank, the docket does not reflect that a summons was ever issued for Bank, no proof of service has been filed, and it has not appeared. (*See* doc. 59-1 at 3-4.)

[3] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

Plaintiff claims that on January 1, 2007, Trustee posed as Father and "submitted a change in beneficiary form for all three Policies away from the Children's Trust, to three Irrevocable Trusts, [for Plaintiff, Sister, and AB]" to provide each with $3 million in life insurance proceeds, even though one of the policies was owned by the Children's Trust and could not be changed. (*Id.*) Stepmother subsequently decided to have more children using the frozen embryos, and through a new surrogate, had twin babies, NB and CB. (*Id.*) Stepmother again allegedly "compelled" Father to change his will to include AB, NB, and CB, but he refused. (*Id.* at 8.)

In December 2007, Father's cancer exacerbated, and he underwent unsuccessful treatments for months before doctors discovered a drug called Tysabri, which they believed could work, in August 2008. (*Id.* at 8-9.) They were unable to obtain approval from its maker, Biogen, to administer the drug, however. (*Id.* at 10-11.) According to Plaintiff, after months of efforts, including by several high-profile individuals, Stepmother "secured a deal with [Father on October 15, 2008,] wherein [he] would review and revise his estate plan if [Stepmother] successfully gained Biogen's approval." (*Id.* at 14.) The next day, on October 16, 2008, doctors allegedly informed Father while he was in intensive care that he had been approved to receive Tysabri, and they administered the drug to him that night. (*Id.* at 12-14.)

The following morning, on October 17, 2008, Father and Stepmother allegedly had a telephone conference from the hospital with Estate Lawyer, during which they amended [Father's] last will and executed change of beneficiary designation forms for each of the Policies . . . away from the trusts of the children, and to [Stepmother] herself as the new sole beneficiary of the entire $9,000,000 in proceeds." (*Id.* at 14-15.) Plaintiff claims that Estate Lawyer represented Stepmother's best interests, even though he still represented Father, and he helped change all of the

insurance policies to benefit her.  (*Id.* at 15.)

On October 18, 2008, Father returned home to hospice, and he passed away on October 30, 2008.  (*Id.* at 15-16.)  Plaintiff contends that on October 31, 2008, Father received a letter from Insurer stating that the new beneficiary designation form had not been properly completed and that a new form must be completed, which meant that the beneficiary of the policy had not been effectively changed. (*Id.* at 16-17.) Nevertheless, Stepmother still filed a claim after Father's death. (*Id.* at 17.)

On December 12, 2008, Plaintiff and Sister attended a meeting with Stepmother and Estate Lawyer.  (*Id.*)  Plaintiff claims: they were not told to bring a lawyer; Stepmother and Estate Lawyer represented Estate Lawyer as being everyone's lawyer; they never disclosed that he represented Stepmother; they were under the impression that Estate Lawyer was their attorney because he represented Father's estate; and they were led to believe Estate Lawyer had the power to carry out Father's wishes on behalf of everyone.  (*Id.*)  Stepmother and Estate Lawyer allegedly told him and Sister that (1) Father had "left a mess of a problem," but that they were "working on moving everything around;" (2) they were left with zero and "were expected to receive nothing via the will, nor via any life insurance policies," although that was not Father's intent; and (3) Father had created a tax burden for Stepmother of $4.5 million in taxes if they did not "change things around."  (*Id.* at 18.)  They said that they had convinced Father to switch the insurance policies so the money would go to Stepmother tax free, "and that if everyone cooperates, [she] would try to get [Plaintiff and Sister] some of that money back over time."  (*Id.*)  Plaintiff contends that they asserted on multiple occasions that Plaintiff would be responsible for up to $1.5 million in taxes if the $3 million in proceeds destined for his irrevocable trust were received by him instead of Stepmother, and that if

he did not cooperate, the alternative would be a trust controlled by Stepmother, who would not ever be required to distribute any funds to him. (*Id.* at 18-19.)

Plaintiff decided he should obtain an attorney after more discussions with Stepmother and Estate Lawyer. (*Id*. at 20.) Trustee allegedly reached out to Plaintiff "to help him, as a friend, after learning there was a problem with Stepmother," and he urged him to hire Attorney, which Plaintiff did. (*Id*. at 20.) Plaintiff claims that Trustee did not tell him that he had been paid by Stepmother to reach out to him at that time, or that he expected Plaintiff to pay him for his "help." (*Id*.) After gaining Plaintiff's trust, Attorney notified him that Trustee had "allegedly signed" an assignment to transfer ownership of the Transamerica Policy. (*Id.* at 21.) He also stated that Trustee was a "friend and client," that he did not benefit from the transfer, and that any claim against him could affect his testimony against Stepmother. (*Id.*) As a result, Plaintiff never pursued a claim against Trustee, and he was unaware of the nature of Trustee's relationship with Stepmother. (*Id.*)

In connection with discussions about a mediation between Plaintiff and Stepmother, Estate Lawyer sent an email suggesting that they use Mediator. (*Id.*) Mediator allegedly provided no notice of his "significant past and then current relationships" with Stepmother and Trustee, of which Plaintiff was unaware. (*Id*. at 21.) At the mediation, Plaintiff "signed a settlement agreement, assuming that it ended all matters, but later was informed for the first time that the agreement that had been made in [m]ediation was only a term sheet." (*Id*. at 22.) He claims that when he "refused to accept the contract" because he thought the signed mediation document was binding, Stepmother and Mediator pressured him and threatened lawsuits against him. (*Id*.) "Plaintiff and [Stepmother] ultimately executed a [s]ettlement [a]greement in November, 2009, wherein Plaintiff received a sum of $700,000 in cash after taxes and $250,000 into his trust . . . ." (*Id*.) The trusts to which Plaintiff

5

was a beneficiary, and Bank were also parties to the settlement agreement. (doc. 7-1 at 37.) Plaintiff claims that a material part of the settlement agreement was Stepmother's promise to pay taxes on the insurance policies, and that "[s]he paid a total of ~$660,000 in taxes on the estate, and thus has not accounted for the insurance policy benefits without causing tax evasion risk for the estate trust to which Plaintiff remains a beneficiary of." (doc. 85 at 22.) Also material was her promise to fund the individual trusts for AB, NB, and CB with $1.5 million each. (*Id.*)

On June 12, 2017, after originally filing this suit, Plaintiff allegedly received an email from Stepmother's attorney with an affidavit stating that the trusts for AB, NB, and CB were irrevocable and had assets exceeding $1.5 million. (*Id.* at 23.) He requested additional information about the trusts because the affidavit did "not refer to the specific trusts that were attached to the [s]ettlement [a]greement." (*Id.*) Stepmother's attorney then responded by attaching "the trust documents for the girls' irrevocable trusts, updated as a result of a change in trustee." (*Id.*) According to Plaintiff, the attached trusts were not the exact ones attached to the settlement agreement, but instead were "new trusts, which were first created on April 14, 2017, on which date each trust had been funded with a total of only $10.00." (*Id.* at 24.) Stepmother's attorney allegedly refused to supply more information regarding the trusts. (*Id.*)

Defendants have moved to dismiss all claims against them under Rule 12(b)(6) for failure to state a claim.[4] (docs. 67; 69; 71; 73; 86.) Plaintiff did not file responses to the motions, and they

---

[4] After some Defendants moved to dismiss Plaintiff's first amended complaint, he sought and was granted leave to file his second amended complaint over their opposition. (*See* docs. 77, 84.) Defendants were given the option to file new motions to dismiss or to stand on their pending motions, which would be construed as being directed at the second amended complaint. (*See* doc. 84 at 4-5.)

are now ripe for recommendation.[5]

## II. 12(b)(6)

Defendants move to dismiss Plaintiff's amended complaint under Rule 12(b)(6) for failure

to state a claim. (*See* docs. 66 at 1; 66-1 at 7; 70 at 12-13; 72 at 12; 74 at 13; 87 at 2, 6-8.)

Rule 12(b)(6) allows motions to dismiss for failure to state a claim upon which relief can be

granted. Fed. R. Civ. P. 12(b)(6).  Under the 12(b)(6) standard, a court cannot look beyond the face

of the pleadings.  *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996); *see also Spivey v. Robertson*,

197 F.3d 772, 774 (5th Cir. 1999), *cert. denied*, 530 U.S. 1229 (2000).  It is well-established that

"*pro se* complaints are held to less stringent standards than formal pleadings drafted by lawyers."

*Miller v. Stanmore*, 636 F.2d 986, 988 (5th Cir. 1981).  Nonetheless, regardless of whether the

plaintiff is proceeding *pro se* or is represented by counsel, pleadings must show specific, well-

pleaded facts, not mere conclusory allegations to avoid dismissal.  *Guidry v. Bank of LaPlace*, 954

F.2d 278, 281 (5th Cir. 1992).  The court must accept those well-pleaded facts as true and view them

in the light most favorable to the plaintiff.  *Baker*, 75 F.3d at 196.  "[A] well-pleaded complaint may

proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and

'that a recovery is very remote and unlikely.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)

(citation omitted).  Nevertheless, a plaintiff must provide "more than labels and conclusions, and

a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 555; *accord Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasizing that "the tenet that a court must accept as true all

of the allegations contained in a complaint is inapplicable to legal conclusions").  The alleged facts

---

[5] Plaintiff sought leave to file and unilaterally filed an untimely response to Law Firm's motion, which was stricken for failure to comply with the local rules because he had been specifically advised of their requirements.  (*See* docs. 93-96.)  Even if considered, however, the response would not change the recommendation.

must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In short, a complaint fails to state a claim upon which relief may be granted when it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570.

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 556 U.S. at 678 (citations omitted). When plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570; *accord Iqbal*, 556 U.S. at 678.

As noted, a court cannot look beyond the pleadings in deciding a 12(b)(6) motion. *Spivey*, 197 F.3d at 774; *Baker*, 75 F.3d at 196. When a party presents "matters outside the pleadings" with a Rule 12(b)(6) motion to dismiss, a court has "complete discretion" to either accept or exclude the evidence for purposes of determining the motion. *Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 196 n.3 (5th Cir. 1988); *accord Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 783 (5th Cir. 2007). "If . . . matters outside the pleading[s] are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

For purposes of a Rule 12(b)(6) motion, "pleadings" include attachments to the complaint. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Similarly, documents "attache[d] to a motion to dismiss are considered part of the pleadings, if they are referred to in the plaintiff's complaint and

8

are central to [his] claim[s]." *Collins*, 224 F.3d at 499 (quotations omitted); *accord Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 725 (5th Cir. 2003). It is also "clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007); *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994). Documents falling in these three categories may be properly considered without converting the motion to dismiss into a motion for summary judgment.

Stepmother attached to her motion copies of the settlement agreement between her, Plaintiff, Plaintiff's trusts, and Bank, with attachments, including the trust agreements for her three daughters, Plaintiff's irrevocable trust agreement and related documents, and a declaration from one of her attorneys verifying the settlement agreement as a true and correct copy. (*See* doc. 72-1.) Although these filings are not attached to Plaintiff's complaint, they may be considered part of the pleadings because they are attached to Stepmother's motion to dismiss, referred to throughout the complaint, and central to Plaintiff's claims. (*See* doc. 85.) *In re Katrina Canal Breaches Litig.*, 495 F.3d at 205; *Collins*, 224 F.3d at 498–99. Accordingly, it is unnecessary to convert Stepmother's motion to dismiss into a motion for summary judgment.

## A.    Breach of Contract

Defendants move to dismiss Plaintiff's breach of contract claim for failure to state a claim. (docs. 66-1 at 6; 70 at 14-15; 72 at 15-23; 74 at 17-18; 87 at 10.)[6]

The essential elements of a breach of contract claim in Texas[7] are: (1) the existence of a valid

---

[6] Law Firm and Estate Lawyer acknowledge that Plaintiff appears to only assert this claim against Stepmother, but move to dismiss in an abundance of caution. (*See* doc. 87 at 10.) Attorney also states that this claim is only asserted against Stepmother and not against him. (*See* doc. 66-1 at 6.)

[7] "It is a long-recognized principle that federal courts sitting in diversity cases 'apply state substantive law and federal procedural law.'" *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 417 (2010) (quoting

contract; (2) breach of the contract by the defendant; (3) performance or tendered performance by the plaintiff; and (4) damages sustained by the plaintiff as a result of the defendant's breach. *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (citing *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.—Houston [14th Dist.] 2005, pet. denied)). "A breach occurs when a party fails or refuses to do something [s]he has promised to do." *Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). "Whether a party has breached a contract is a question of law." *Gardocki v. J.P. Morgan Chase Bank*, No. 12-2254, 2014 WL 12537076, at *4 (S.D. Tex. June 11, 2014) (citing cases).

### 1.    Stepmother[8]

Plaintiff appears to allege that Stepmother breached the settlement agreement by not fulfilling her "promise to pay taxes on the insurance policies" and by not complying with section 3:13, relating to the provision of trusts for her daughters. (doc. 85 at 22-23.) Stepmother argues that Plaintiff has failed to state a breach of contract claim because he failed to "adequately plead his performance of the [a]greement," to identify the specific contract provision requiring her to pay taxes, or to plead facts showing a breach of section 3:13. (doc. 72 at 16-23.)

#### a.    Performance

Stepmother first moves to dismiss the contract claim on grounds that Plaintiff failed to

---

*Hanna v. Plumer*, 380 U.S. 460, 465 (1965)). In this diversity case, the events giving rise to the claims are alleged to have occurred in Texas (doc. 85 at 2), and the parties do not dispute that Texas law applies. *See De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1413 (5th Cir. 1995) (quoting *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984)) ("[T]he law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue.").

[8] Stepmother initially argues that Plaintiff's first amended complaint is untimely as to her because he filed it without leave of court more than 21 days after she filed her motion to dismiss, and that the Court should first determine whether the original complaint is the operative complaint against her. (*See* doc. 72 at 13-14.) Because Plaintiff was subsequently granted leave of court to file his second amended complaint, and her motion has been construed as being directed against that filing, this argument is moot.

"adequately plead his performance of the [a]greement."  (doc. 72 at 16-17.)

As noted, performance or tendered performance is an element of Plaintiff's breach of contract claim.  *See Mullins*, 564 F.3d at 418.  Although Plaintiff's complaint  alleges that he "attempted to honor the [a]greement", he does not identify which obligations were fulfilled or how.  (*See* doc. 85 at 24.)  His conclusory allegation is insufficient to show how he performed or tendered performance under the agreement.  *See Mbakwe v. PNC Bank, N.A.*, No. 3:17-CV-856-M-BH, 2017 WL 5956821, at *2 (N.D. Tex. Nov. 3, 2017), *adopted by* 2017 WL 5901000 (N.D. Tex. Nov. 30, 2017) (conclusory allegation that the plaintiffs fulfilled their obligations was insufficient to support a claim for breach of contract).  He has therefore failed to plead a plausible breach of contract claim.

### b.    Failure to pay taxes

Stepmother next alleges that Plaintiff has not identified the specific provision of the contract that she allegedly violated by failing to pay taxes, and that he does not assert that he suffered any damages from the alleged breach.  (*See* doc. 72 at 17-18.)

It is well-settled that a plaintiff must allege which provision the defendant breached in order to state a claim for breach of contract.  *See Williams v. Wells Fargo Bank, N.A.*, 560 F. App'x 233, 238 (5th Cir. 2014) (finding that the plaintiffs failed to state a claim for breach of contract where they did not identify which provision of the contract was breached); *see also Payne v. Wells Fargo Bank, N.A.*, No. 3:12–CV–5219-M, 2013 WL 5451856, at *7 (N.D. Tex. Sept. 27, 2013) ("In order to survive a Rule 12(b)(6) motion to dismiss, a plaintiff alleging a breach of contract claim must indicate which loan documents and provisions were breached."); *Chapa v. Chase Home Fin. LLC*, No. C–10–359, 2010 WL 5186785, at *5 (S.D. Tex. Dec. 15, 2010) (collecting Texas cases dismissing breach of contract claims where the plaintiff failed to show the contract or provision that

11

the defendant breached). Additionally, a plaintiff must show that he sustained damages as a result of the breach. *See Genesco Sports Enterprise, Inc. v. White*, No. 3:11-CV-1345-N (BF), 2011 WL 6593415, at *10 (N.D. Tex. Oct. 27, 2011) (stating the elements for a breach of contract claim); *Mullins*, 564 F.3d 418 (citing *Aguiar*, 167 S.W.3d at 450) (same).

Here, Plaintiff asserts that Stepmother "promise[d] to pay taxes on the insurance policies," and that "[s]he paid a total of ~$660,000 in taxes on the estate, and thus has not accounted for the insurance policy benefits without causing tax evasion risk for the estate trust to which Plaintiff remains a beneficiary of." (doc. 85 at 22.) He does not allege which provision of the settlement agreement Stepmother breached by allegedly failing to "pay taxes on the policies," however. (*See id.*) He also does not allege that he suffered any pecuniary damages from this alleged action. (*See id.*); *Peterson Grp., Inc. v. PLTQ Lotus Grp., L.P.*, 417 S.W.3d 46, 64 (Tex. App.—Houston 2013, pet. denied) ("To recover damages for breach of contract, a plaintiff must show that he suffered a pecuniary loss as a result of the breach."). He only alleges "tax evasion risk" for an estate trust to which he is allegedly a beneficiary. (doc. 85 at 22.) "Tax evasion risk" is not a pecuniary loss, and Plaintiff does not allege any other damages that were actually sustained as a result of the Stepmother's alleged failure to pay taxes. *See BCC Merch. Sols., Inc. v. Jet Pay, LLC*, 129 F. Supp. 3d 440, 473 (N.D. Tex. Sept. 8, 2015) ("In Texas, the general rule for measuring damages for the breach of contract is just compensation for . . . damage actually sustained." (citations omitted)).[9]

Because Plaintiff has not identified the provision Stepmother allegedly breached by not

---

[9] Stepmother also asserts that Plaintiff cannot base his breach of contract claim on her alleged "income tax evasion" because there is no private right of action for tax evasion. (doc. 72 at 20.) The courts that have considered this issue have found no private right of action for income tax evasion. *See Gipson v. Deutsche Bank Nat'l Tr. Co.*, No. 3:13-CV-4820-L (BH), 2015 WL 11120538, at *20 (N.D. Tex. Oct. 27, 2015) (citing cases). It is not clear that Plaintiff bases his breach of contract claim on alleged income tax evasion, but to the extent that he does, he fails to state a claim.

paying taxes on the insurance policies, or pleaded any damages he actually sustained as a result of this action, this allegation does not support a claim for breach of contract as a matter of law. *See Williams*, 560 F. App'x at 238; *Mullins*, 564 F.3d at 418 (citing *Aguiar*, 167 S.W.3d at 450).

      **c.**      **Trusts**

Stepmother also asserts that based on the plain language of section 3:13, Plaintiff has not alleged a plausible claim that she breached the settlement agreement.  (doc. 72 at 21-23.)

Section 3:13 provides:

> [Stepmother] agrees to maintain in full force and effect during [Stepmother's] lifetime, the trusts attached hereto as Exhibit B for each of her minority daughters. [Stepmother] agrees that [Stepmother] will provide in her will or otherwise, that upon [Stepmother's] death prior to any such child having attained the age of 18, that each such trust shall be funded with at least $1,500,000 of cash, cash equivalents or marketable securities.

(doc. 85 at 22-23; *see* doc. 72-1 at 11.)

Plaintiff appears to assert that Stepmother has not currently funded the three trusts with $1.5 million each.  (doc. 85 at 22-23.)  He also argues that even if Stepmother "in some way designated over [$1.5 million] for each of Plaintiff's three heirs," she failed to maintain that amount in the three specific trusts attached to the settlement agreement.  (*Id*. at 23.)  He bases his assertions on trust documents he received from Stepmother's attorney; he contends the documents were not for the trusts attached to the settlement agreement, "but instead were [for] new trusts, which were first created on April 14[], 2017, on which date each trust had been funded with a total of only $10.00." (*Id*. at 23-24.)

According to the plain language of section 3:13, Stepmother agreed to maintain the trusts for her three daughters and to ensure that those trusts would each be funded with $1.5 million should she die prior to any of them reaching the age of eighteen.  (docs. 85 at 23; 72-1 at 11.) This language

does not require Stepmother to presently fund the three trusts with $1.5 million each. (*See* doc. 72-1 at 11.) Rather, it requires her to ensure the trusts will be funded with $1.5 million each upon her death if she dies before any of her daughters reach the age of eighteen. (*See id*.); *see also ART Midwest, Inc. v. Clapper*, No. 3:99-CV-2355-N, 2009 WL 10646744, at *18 (N.D. Tex. Sept. 22, 2009) (citing cases) ("A contract that is susceptible of a definite legal meaning or interpretation is unambiguous" and should be construed "in accordance with the plain meaning of its express words.").

Plaintiff speculates that if "tragedy were to happen, and [Stepmother] were to pass away and lose all of her own assets, such that the trusts 'shall not' be funded, . . . then [she] would have been, as she is now, in breach of contract." (doc. 85 at 23.) His speculative statements contradict the plain language of the provision and do not sufficiently plead facts showing that Stepmother violated section 3:13 of the settlement agreement by not ensuring that her daughters' trusts will be properly funded should she die before they reach the age of eighteen. (*See* doc. 85 at 23.)

Plaintiff also alleges that the trusts Stepmother's attorney sent him are "new" trusts because they "were created on April 14, 2017" and funded with only $10.00. (*Id*. at 24.) He acknowledges, however, that Stepmother's attorney informed him that the trusts had been "updated as a result of a change in trustee," which is expressly permitted by the trusts. (*Id*. at 23; *see* doc. 72-1 at 38-41, 57-59, 75-76 (containing provisions for successor trustee).) That they were funded with "only $10.00" also fails to show how these were new trusts. Even taking Plaintiff's allegations that the trusts were only funded with that amount as true, as the Court must, he has not alleged facts to support his claim that Stepmother breached the agreement because the provision does not require her to currently fund the trusts with $1.5 million each. (*See* docs. 85 at 23; 72-1 at 11.)

14

In conclusion, even taking Plaintiff's allegations as true as required under Rule 12(b)(6), he has not alleged a plausible claim for breach of contract against Stepmother as a matter of law. His breach of contract claim against her should therefore be dismissed for failure to state a claim.[10]

### 2.    Trustee, Mediator, Estate Lawyer, and Law Firm

Trustee, Mediator, Estate Lawyer, and Law Firm move to dismiss Plaintiff's breach of contract claim on grounds that a valid contract does not exist between them and Plaintiff. (docs. 66-1 at 6; 70 at 14-15; 74 at 17-18; 87 at 10.)

Plaintiff alleges that the contract at issue is the settlement agreement. (doc. 85 at 24.) The settlement agreement was entered into between Stepmother, Plaintiff, his trusts, and Bank. (doc. 72-1 at 6.) Attorney, Trustee, Mediator, Estate Lawyer, and/or Law Firm were not parties to that agreement, and Plaintiff has not pleaded sufficient facts to show any other valid contract between himself and these defendants. (*See id.*; *see* doc. 85); *see also Calce v. Dorado Exploration, Inc.*, 309 S.W.3d 719, 737 (Tex. App.—Dallas 2010, petition) (finding that the appellee did not meet his burden to prove a valid contract where appellants were not parties to the agreement at issue).

Because the first element is lacking, Plaintiff's breach of contract claim against Trustee, Mediator, Estate Lawyer, and Law Firm, if any, fails as a matter of law and should be dismissed for failure to state a claim. *See Adams v. Chase Bank*, No. 3:14-CV-3157-K, 2015 WL 2168127, at *4 (N.D. Tex. May 8, 2015) (denying breach of contract claim under Rule 12(b)(6) where the plaintiff failed to identify the contract that the defendant allegedly breached).[11]

---

[10] Because Stepmother's initial arguments are dispositive, her remaining arguments, including that this claim is barred by the settlement agreement or the statute of limitations, are not addressed. (*See* doc. 72 at 18-20.)

[11] To the extent that this claim is also asserted against Attorney, it is subject to dismissal for the same reasons as any claim against the moving Defendants. Although Attorney has not expressly moved to dismiss this claim, as discussed more fully below, a court may *sua sponte* dismiss claims on its own motion under Rule 12(b)(6) for failure

## B.    Civil Conspiracy to Commit Fraud

Defendants move to dismiss Plaintiff's claim for civil conspiracy to commit fraud.  (docs. 66-1 at 6-7; 70 at 2, 15-25; 72 at 2, 23-30; 74 at 2, 18-26; 87 at 2, 10-14.)

Under Texas law, civil conspiracy is "a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.  The essential elements are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Rodgers v. City of Lancaster Police*, No. 3:13-CV-2031-M-BH, 2017 WL 457084, at *16 (N.D. Tex. Jan. 6, 2017), *adopted by* 2017 WL 447216 (N.D. Tex. Feb. 2, 2017) (quoting *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)).  "[I]n short, there must be a preconceived plan and unity of design and purpose, for the common design is of the essence of the conspiracy."  *I Love Omni, LLC v. Omnitrition Int'l, Inc.*, No. 3:16-CV-2410-G, 2017 WL 1281130, at *3 (N.D. Tex. Apr. 6, 2017) (quoting *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex. 1968)).  "[A] defendant's liability for conspiracy depends on [his or her] participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable."  *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).  Additionally, it requires a specific intent.  *I Love Omni*, 2017 WL 1281130, at *3.

### 1.    Meeting of the Minds

Defendants argue that Plaintiff has not alleged facts to support the requirement of a meeting of the minds.  (docs. 66-1 at 7; 70 at 19; 72 at 24-25; 74 at 18-20.)

---

to state a claim as long as the plaintiff has notice of its intention and an opportunity respond.  *See Carroll v. Fort James Corp.*, 470 F.3d 1171, 1177 (5th Cir. 2006).

16

"To satisfy the 'meeting of the minds' element, [Plaintiff] must allege that [D]efendants had the 'specific intent to agree to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.'" *Samsung Elecs. Am., Inc. v. Yang Kun Chung*, No. 3:15-CV-4108-D, 2017 WL 635031, at *13 (N.D. Tex. Feb 16, 2017) (quoting *Wackman v. Rubsamen*, 602 F.3d 391, 408 (5th Cir. 2010)). The plaintiff "must allege that there was a 'preconceived plan and unity of design and purpose.'" *Id.* (citing *Goldstein v. Mortenson*, 113 S.W.3d 769, 779 (Tex. App.—Austin 2003, no pet.)

Here, Plaintiff alleges that Defendants each played a part in a plan to transfer $9 million away from him and his heirs by changing the designated beneficiaries on the Policies. (doc. 85 at 26, 28.) He asserts that "Defendants came together with and through each other in agreement to help further the plan, knowing the plan was a crime" and that each gained something "as a result of playing their part." (*Id.*) Specifically, he alleges that: (1) Estate Lawyer agreed to help Stepmother and orchestrated the plan to designate Stepmother as the beneficiary of the Policies in order to benefit himself and Law Firm; (2) Trustee agreed to help "her achieve her fraudulent outcome" by updating her on "Plaintiff's private thoughts, strategies[,] and plans" and leading him to hire Attorney; (3) Attorney helped to secure Mediator, who agreed to join Stepmother's conspiracy by turning the mediation in her favor; (4) Law Firm assisted Stepmother in committing fraud; (5) Bank did not "help protect Plaintiff from the conspiracy"; (6) Insurer "joined the conspiracy by agreeing to change the beneficiary" on the Policy it held for Father after he passed away; and (7) Stepmother induced Father "to alter his will and the Policies and fraudulently" prevented Plaintiff from receiving an inheritance or gift. (*Id.* at 28-29.)

Plaintiff's speculative and conclusory allegations do not plausibly show a "preconceived

17

plan" by Defendants to commit fraud or to do anything in furtherance of committing fraud. *Samsung Elecs. Am., Inc.*, 2017 WL 635031, at *13. Plaintiff also fails to allege a time and place at which Defendants "had a meeting of the minds regarding the object of the conspiracy." *Samsung Elecs. Am., Inc.*, 2017 WL 635031, at *13 (citing cases that dismissed conspiracy claims for failure to specify when and where a meeting of the minds took place). Even accepting his well-pleaded facts as true, the alleged facts do not raise his "right to relief above the speculative level." *Twombly*, 550 U.S. at 555.[12]

### 2.    *Underlying Tort*

Defendants also assert that the civil conspiracy claim should be dismissed because Plaintiff has not sufficiently pleaded the underlying tort of fraud, as required by Rule 9(b). (docs. 66 at 1; 70 at 16-18; 72 at 8, 12, 25; 74 at 9, 20; 87 at 6, 12-13.) Plaintiff alleges that Defendants stole $9 million "by fraudulently changing the life insurance policies away from irrevocable trusts for the children, to [Stepmother], while leaving the rest of the family . . . with absolutely zero by the time anyone found out about it." (doc. 85 at 3-4, 26-29.)

"The elements of fraud in Texas are (1) the defendant made a representation to the plaintiff; (2) the representation was material; (3) the representation was false; (4) when the defendant made the representation[,] the defendant knew it was false or made the representation recklessly and without knowledge of its truth; (5) the defendant made the representation with the intent that the plaintiff act on it; (6) the plaintiff relied on the representation; and (7) the representation caused the plaintiff injury." *Shandong Yinguang Chem. Indus. Joint Stock Co. Ltd., v. Potter*, 607 F.3d 1029,

---

[12] As noted, a court may *sua sponte* dismiss claims on its own motion for failure to state a claim. *See Carroll*, 470 F.3d at 1177. Although Estate Lawyer and Law Firm do not expressly move to dismiss this claim on this basis, it is subject to dismissal against them for the same reasons as against the moving Defendants. (*See* doc. 87 at 10-14.)

1032–33 (5th Cir. 2010) (per curiam) (citing *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001)).

A claim for fraud is subject to the heightened pleading requirement of Rule 9(b). *Potter*, 607 F.3d at 1032. Rule 9(b) contains a heightened pleading standard and requires a plaintiff to plead the circumstances constituting fraud with particularity. *See* Fed. R. Civ. P. 9(b); *City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 153 (5th Cir. 2010). "[A]rticulating the elements of fraud with particularity requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Techs.*, 112 F.3d 175, 177 (5th Cir. 1997). "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out" with respect to a fraud claim. *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (quoting Williams, 112 F.3d at 179).

With respect to Stepmother and Estate Lawyer, Plaintiff alleges that on "October 17, 2008, [Father] and [Stepmother], while in the Mayo hospital room, and [Estate Lawyer], via conference from Dallas, amended [Father's] last will and executed change of beneficiary forms for each of the Policies . . . away from the trusts of the children, and to [Stepmother] as the new sole beneficiary of the entire [$9 million] in proceeds." (*Id.* at 14.) He asserts that by changing the Policies, Stepmother and Estate lawyer stole "$6 [m]illion in cash proceeds from the Children's Trust, and $3 [m]illion from each of the irrevocable trusts of [Plaintiff], [Sister], and AB." (*Id.* at 15.) Plaintiff has not met the heightened pleading requirements against Stepmother and Estate Lawyer by specifying the "who, what, when, where, and how" of any fraudulent statements they made to *him* as required under Rule 9(b). *See Williams*, 112 F.3d at 177; *see also* Fed. R. Civ. P. 9(b).

19

Regarding the remaining Defendants, Plaintiff asserts only that they acted with Stepmother to fraudulently change the Policies, Trustee helped Stepmother "to achieve her fraudulent outcome", and Law Firm "carried on the fraud" when confronted by Plaintiff.  (doc. 85 at 3, 28-29.)  Again, he does not identify any material, false representations that these Defendants made to *him* regarding the beneficiary changes to the Policies.  (*See* doc. 85.)  Even liberally construing Plaintiff's assertions, they fall well short of the heightened pleading requirements required under Rule 9(b). *See Williams*, 112 F.3d at 177; *see also* Fed. R. Civ. P. 9(b).

Because he has failed to plead the underlying tort of fraud against Defendants with sufficient particularity as required by Rule 9(b), his civil conspiracy claim against them should be dismissed.[13]

### 3.    *Statute of Limitations*

Defendants also assert that this claim should be dismissed because it is barred by the statute of limitations.  (docs. 66-1 at 6, 8-10; 70 at 25; 72 at 30; 74 at 21; 87 at 10-12.)

Although the statute of limitations is an affirmative defense, a defendant may move for dismissal under Rule 12(b)(6) if the facts giving rise to this defense "appear[ ] on the face of the complaint."  *Simmons v. Local 565 Air Transp. Div. Transp. Workers Union of Am. AFL-CIO*, No. 3:09-CV-1181-B, 2010 WL 2473840, at *4 (N.D. Tex. June 16, 2010) (citing *Kansa Reinsurance Co. v. Cong. Mortgage Corp. of Texas*, 20 F.3d 1362, 1366 (5th Cir. 1994)).

---

[13] Stepmother, Mediator, Estate Lawyer, and Law Firm also assert that Plaintiff cannot base his civil conspiracy claim on their alleged breach of contract, "premeditated tax evasion," and or the Texas Penal Code because such a conspiracy would not be actionable under Texas law.  (docs. 72 at 24-25; 74 at 19; 87 at 14.)  "[A] conspiracy to breach a contract is not actionable under Texas law."  *Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*, 331 F.3d 452, 463 (5th Cir. 2003); *see also Williams v. Fed. Nat'l Mortg. Ass'n*, No. 2:11–CV–157–J, 2012 WL 443986, at *4 (N.D. Tex. Feb. 13, 2012) ("Conspiracy for breach of contract is not actionable under Texas law").  There is also no private cause of action for income tax evasion in Texas.  *See Gipson*, 2015 WL 11120538, at *20 (citing cases).  Nor does the Texas Penal Code create a private right of action. *See Gipson v. Callahan*, 18 F.Supp.2d 662, 668 (W.D. Tex. 1997) (noting that the Texas Penal Code does not create a private right of action), appeal dism'd, 157 F.3d 903 (5th Cir. 1998). Any civil conspiracy claim based on these alleged actions is subject to dismissal.

"Conspiracy to commit fraud claims are subject to a two-year statute of limitations." *Taylor v. Deutche Bank AG*, No. 3:14-CV-0453-N, 2014 WL 12586180, at *7 (N.D. Tex. Nov. 24, 2014) (citing *Navarro v. Grant Thornton, LLP*, 316 S.W.3d 715, 719 (Tex. App.—Houston [14th Dist.] 2010, no pet.)). The statute of limitations for a civil conspiracy claim begins to run "when Plaintiff knew or should have known of the overt acts involved in the alleged conspiracy." *Rhine v. Deaton*, No. 3:11-CV-0698-O (BK), 2011 WL 2925057, at *3 (N.D. Tex. June 16, 2011), *adopted by* 2011 WL 2938251 (N.D. Tex. July 20, 2011) (citing *Helton v. Clements*, 832 F.3d 332, 335 (5th Cir. 1987)); *see also Leigh v. Danek Med. Inc.*, 28 F. Supp. 2d 401, 406 (N.D. Tex. June 25, 1998) ("The statute of limitations [for a civil conspiracy claim] begins to run the plaintiff discovers, or with the exercise of reasonable diligence, should have discovered the nature of his injury.").

Here, the overt act in the alleged conspiracy to commit fraud is Defendants' alleged action of transferring $9 million away from Plaintiff and his heirs by changing the designated beneficiaries on the Policies. (doc. 85 at 26.) Plaintiff alleges that this took place on October 17, 2008, when Stepmother and Estate Lawyer "executed change of beneficiary designation forms for each of the Policies," and that they informed Plaintiff and Sister of the changes at a meeting on December 12, 2008. (*Id*. 14-15, 17-18.) It is apparent from the face of Plaintiff's complaint that he knew of the overt act, e.g., the change in beneficiary on the Policies, by that date. Additionally, information regarding the Policies was included in the settlement agreement, which Plaintiff concedes was executed in November 2009. (*See* docs. 85 at 22; 72-1 at 6-7.) Specifically, the agreement stated that "[u]pon [Father's] death, the Life Insurance Policies were payable and paid to [Stepmother] as sole beneficiary per the terms of those policies. At certain points prior to October 17, 2008, one of

21

the beneficiaries . . . had been [Plaintiff's] 2005 Trust." (doc. 72-1 at 7.)[14]

Because Plaintiff filed this suit on December 20, 2016, outside of the two-year statute of limitations, his claim for civil conspiracy to commit fraud is time-barred. *See Taylor*, 2014 WL 12586180, at *7 (dismissing claim for civil conspiracy to commit fraud because it was barred by the two-year statute of limitations); *Drake v. Fitzsimmons*, No. 3:12-CV-1436-B, 2013 WL 775354, at *2-4 (N.D. Tex. Mar. 1, 2013) (dismissing claims under Rule 12(b)(6) based on limitations).

## C.    Tortious Interference with an Expectancy

Defendants assert that this claim should be dismissed because tortious interference with an expectancy of an inheritance or gift is not a recognized claim in Texas, or alternatively, because this claim is barred by the statute of limitations. (docs. 66-1 at 6; 70 at 26; 72 at 30; 74 at 26; 87 at 14.)[15]

Although some Texas courts of appeals have recognized a cause of action for tortious interference with an expectancy of an inheritance or gift, the Texas Supreme Court has specifically found that "[n]either [its] precedent nor the Legislature has blessed tortious interference with an inheritance as a cause of action in Texas." *Kinsel v. Lindsey*, 526 S.W.3d 411, 423 (Tex. 2017); *see Anderson v. Archer*, 490 S.W.3d 175, 176 (Tex. App.—Austin 2016, pet. granted) (refusing to recognize a cause of action for tortious interference with an expectancy but citing other Texas cases recognizing that action); *but see Wackman v. Rubsamen*, 602 F.3d 391, 410 (5th Cir. 2010) (stating

---

[14] Plaintiff makes no argument that the discovery rule should apply to toll the statute of limitations. (*See* doc. 85.) He only conclusively asserts that Stepmother "actively carr[ies] on the fraud today, with the concealment of failed promises to make good on material matters that she never intended to keep." (*Id*. at 4.) Even liberally construing this statement as an attempt to toll the statute of limitations, Plaintiff's claim remains barred. He knew about the beneficiary changes by December 12, 2008, and the discovery rule tolls the limitations period only "until the claimant either discovers . . . or should have discovered, the facts establishing the elements of the cause of action." (*Id*. at 17-18.) *Duthu v. Pena*, Nos. 99-40041, 99-40190, 2000 WL 1056127, at *6 (5th Cir. July 20, 2000).

[15] It is not clear whether this claim is separate from, or a part of, the civil conspiracy claim. To the extent that it is a separate claim, Plaintiff appears to only assert it against Stepmother. (*See* doc. 85 at 26-27.)

22

that Texas appellate courts have adopted a cause of action for tortious interference with inheritance). Because the Texas Supreme Court has stated that a claim for tortious inference with an expectancy is not actionable under Texas law, Plaintiff's claim should be dismissed for failure to state a claim.

Even if an action for this claim did exist under Texas law, "[t]ortious interference claims are subject to a two-year statute of limitations [in Texas], which begins to run on the date the cause of action accrues." *See Taylor*, 2014 WL 12586180, at *6 (citing *Burke v. Ins. Auto Auctions Corp.*, 169 S.W.3d 771, 776 (Tex. App.—Dallas 2005, pet. denied)). As stated previously, a tort action accrues "when a wrongful act causes a legal injury." *Priester*, 708 F.3d at 675 (citing *Provident Life & Acc. Ins. Co.*, 128 S.W.3d at 221).

Plaintiff bases his tortious interference claim on changes to the Policies that occurred on October 17, 2008, when Stepmother and Estate Lawyer "amended [Father's] last will and executed change of beneficiary designation forms for each of the Policies . . . ." (doc. 85 at 14.) He asserts that Stepmother "interfered" with his inheritance benefits, while Father was on his deathbed, and caused him to lose "the benefit of the life insurance policies . . . as a result of changes to the insurance designations." (*Id*. at 27.) Any cause of action for tortious interference would therefore have accrued on October 17, 2008, when the allegedly wrongful act of changing the Policies occurred and caused Plaintiff to lose any rights he had in the Policies. (*See id*. at 14, 27.) *see also Priester*, 708 F.3d at 675 (citing *Provident Life & Acc. Ins. Co.*, 128 S.W.3d at 221). Plaintiff first asserted this claim in his original complaint, filed December 20, 2016. (*See* doc. 3.) Because he asserted his claim for tortious interference with an expectancy over eight-years after it accrued, it is necessarily barred by the statute of limitations.

Accordingly, Plaintiff's claim for tortious interference with an expectancy, if it exists, is also

subject to dismissal under Rule 12(b)(6) because it is apparent from the face of his complaint that it is time-barred.[16]

### III. *SUA SPONTE* DISMISSAL

A court may *sua sponte* dismiss a plaintiff's claims on its own motion under Rule 12(b)(6) for failure to state a claim as long as the plaintiff has notice of its intention and an opportunity respond. *See Carroll v. Fort James Corp.*, 470 F.3d 1171, 1177 (5th Cir. 2006) (citing *Shawnee Int'l., N.V. v. Hondo Drilling Co.*, 742 F.2d 234, 236 (5th Cir. 1984)). "The fourteen-day time frame for filing objections to a recommended dismissal provides Plaintiff with notice and an opportunity to respond." *Fantroy v. First Fin. Bank, N.A.*, No. 3:12-CV-0082-N (BH), 2012 WL 6764551, at *7 (N.D. Tex. Dec. 10, 2012), *adopted by* 2013 WL 55669 (N.D. Tex. Jan. 4, 2013) (citing *Ratcliff v. Coker*, No. 9:08-CV-127, 2008 WL 4500321, at *3 n.1 (E.D. Tex. Sept. 26, 2008)).

Plaintiff's only claim against Bank and Insurer appears to be for civil conspiracy to commit fraud. (doc. 85 at 29.) Plaintiff contends that Bank "aided and abetted" Stepmother in the conspiracy by failing to comply with its fiduciary duty as a trustee when it failed to help protect him from the conspiracy and "sided with the [d]efendants when deciding to become party to [t]he [s]ettlement [a]greement." (doc. 85 at 29.) He contends that Insurer "joined the conspiracy by agreeing to change the beneficiary for [the defendants] after [Father] passed away, and . . . took no measures to verify their actions with those who lost beneficiary status under such circumstances." (*Id.*) Plaintiff's conclusory and speculative allegations do not state a plausible claim for relief

---

[16] Defendants also assert that Plaintiff's claims are subject to dismissal because they are barred by the settlement agreement. (docs. 66 at 1; 70 at 10-12, 20-25; 72 at 2, 26-29; 74 at 2, 22-26; 87 at 2, 8-9.) Additionally, Attorney moved to dismiss Plaintiff's claims under Rule 12(b)(7). (*See* docs. 66 at 1; 66-1 at 2.) Because the claims against Defendants are subject to dismissal based on the foregoing reasons under Rule 12(b)(6) for failure to state a claim, these alternative grounds for dismissal are not addressed.

against these defendants for the same reason he fails to state a claim against Defendants—he has not sufficiently pleaded a meeting of the minds or the underlying tort of fraud, and the claim is time-barred. The claim against these defendants should therefore be dismissed *sua sponte*.

## IV. OPPORTUNITY TO AMEND

Notwithstanding their failure to plead sufficient facts, the Fifth Circuit is inclined to give *pro se* plaintiffs several opportunities to state a claim upon which relief can be granted. *See Scott v. Byrnes*, No. 3:07-CV-1975-D, 2008 WL 398314, at *1 (N.D. Tex. Feb. 13, 2008); *Sims v. Tester*, No. 3:00-CV-0863-D, 2001 WL 627600, at *2 (N.D. Tex. Feb. 13, 2001). Courts typically allow *pro se* plaintiffs to amend their complaints when the action is to be dismissed pursuant to a court order. *See Robinette v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 3:96-CV-2923-D, 2004 WL 789870, at *2 (N.D. Tex. Apr. 12, 2004); *Sims*, 2001 WL 627600, at *2. A *pro se* plaintiff may also obtain leave to amend his complaint in response to a recommended dismissal. *See Swanson v. Aegis Commc'ns Grp., Inc.*, No. 3:09-CV-0041-D, 2010 WL 26459, at * 1 (N.D. Tex. Jan. 5, 2010); *Scott*, 2008 WL 398314, at *1. However, "[w]hen a plaintiff is given an opportunity to amend a complaint that fails to state a claim upon which relief can be granted, but refuses to do so, then the district court is justified in dismissing the complaint with prejudice." *Rodriguez v. U.S.*, 66 F.3d 95, 98 (5th Cir. 1995). Additionally, a court may appropriately dismiss an action with prejudice without giving an opportunity to amend if it finds that the plaintiff has alleged his or her best case. *Jones v. Greninger*, 188 F.3d 322, 327 (5th Cir. 1999).

Plaintiff has twice amended his complaint, and it appears that he has alleged his best case. His breach of contract claim fails to state a claim as a matter of law or is asserted against non-parties to the contract. His conspiracy to commit fraud claim is based on conduct that is not actionable

under Texas law or on statements that were not made to him, and it is time-barred. His tortious

interference with an expectancy claim is not actionable under Texas law and is also time-barred.

A further opportunity to amend is unwarranted.

## V. RECOMMENDATION

Defendants' motions to dismiss should be **GRANTED**, and Plaintiff's claims against

them should be **DISMISSED with prejudice** for failure to state a claim. Plaintiff's claim

against Bank and Insurer should be *sua sponte* **DISMISSED with prejudice** for failure to state a

claim.

**SO RECOMMENDED** on this 13th day of February, 2018.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties
in the manner provided by law. Any party who objects to any part of these findings, conclusions
and recommendation must file specific written objections within 14 days after being served with
a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection
must identify the specific finding or recommendation to which objection is made, state the basis
for the objection, and specify the place in the magistrate judge's findings, conclusions and
recommendation where the disputed determination is found. An objection that merely
incorporates by reference or refers to the briefing before the magistrate judge is not specific.
Failure to file specific written objections will bar the aggrieved party from appealing the factual
findings and legal conclusions of the magistrate judge that are accepted or adopted by the district
court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79
F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE